Richard S. Busch (SBN 319881)
richard.busch@arlaw.com
Mark L. Block (SBN 115457)
mark.block@arlaw.com
David Niemierzycki (*pro hac vice* forthcoming)
david.niemierzycki@arlaw.com
Andrew H. "Drew" Davis (*pro hac vice* pending)
drew.davis@arlaw.com
ADAMS & REESE, LLP
1600 West End Ave., Suite 1400
Nashville, TN 37203
Tel: (615) 259-1450
Fax: (615) 259-1470

Jeffrey E. Faucette (SBN 193066)
jeff@skaggsfaucette.com
Martin R. Glick (SBN 40187)
marty@skaggsfaucette.com
SKAGGS FAUCETTE LLP
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
Tel: (415) 874-3181
Fax: (888) 980- 6547

*Attorneys for Plaintiffs Eight Mile Style, LLC and Martin Affiliated, LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EIGHT MILE STYLE, LLC; and MARTIN AFFILIATED, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SUNO, INC.,<br><br>Defendant. | Case Number: 5:26-cv-13399<br><br>**FIRST AMENDED COMPLAINT FOR DIRECT COPYRIGHT INFRINGEMENT, CIRCUMVENTION OF PROTECTION MEASURES, AND REMOVAL OR ALTERATION OF CMI**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, Eight Mile Style, LLC and Martin Affiliated, LLC (collectively, "Eight Mile Style"), for their complaint against Defendant Suno, Inc. ("Suno" or "Defendant") allege, on personal knowledge as to matters relating to themselves, and on information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. Eminem, according to Chart Masters (chartmasters.org) is the ninth best-selling artist of all time ranking above such icons as Frank Sinatra, AC/DC, Elton John, and Led Zeppelin. As such, clearly, Suno wanted Eminem, and, as discussed below, just decided to take these iconic copyrighted songs for its own ingestion, training, and output without license or compensation. The breadth of the copyright infringement is discussed in detail below. In short, Suno has willfully violated every exclusive right under the United States Copyright Act with respect to all of the songs involved in this action in the numerous ways described below. But that is not all, Suno also stole without care, Eminem's likeness, including his voice, as also discussed below.

2. With the original Complaint filed in this Action, Eight Mile identified a handful of exhibits showcasing Suno's infringing output. Yet Suno, in a post-filing statement to various press outlets, doubled down on its false claim that its service does not "trade on anyone's name or likeness," and "do[es] not allow prompts for specific artists' names and songs." Suno's statement is a repurposed version of what it recently represented in a written motion filed in another lawsuit, discussed below. These statements, as shown in the Exhibits attached to the original Complaint, are false, and Plaintiffs have now added a multitude of additional examples to this First Amended Complaint, including 108 further examples of additional infringing output of twenty-six of the Works (as defined below). *See* Collective Exhibit C, lodged with the Court and available publicly at: https://tinyurl.com/6298e65s.

## II. NATURE OF THE CASE

3. Eight Mile Style is an independent music publisher and copyright administration company that owns and administers, with numerous exclusive rights under the United States Copyright Act, including the exclusive right to license, some of the most iconic and successful musical compositions in the world by recording artist Marshall Mathers p/k/a Eminem, including 269

musical compositions identified in Exhibit A (the "Works"). Eight Mile Style brings this action to enforce these rights against the Defendant who has built their entire business model based on copyright infringement at a scale heretofore unseen.

4. Eight Mile Style's catalog includes famous, classic hits by Eminem with billions of streams between them including, inter alia, "Lose Yourself," "Without Me," "Till I Collapse," "The Real Slim Shady," "Stan," and many more household names and titles. The Works are some of the most valuable in the world, and Eight Mile Style is very protective of these legendary songs. A complete list of the Works at issue is attached hereto as Exhibit A. The Works contain some of the most definitive lyrics and melodies in music history.

5. Suno, a Delaware corporation with its principal place of business in Cambridge, Massachusetts, with additional offices in New York, Los Angeles, and San Francisco, has admitted to copying "essentially all music files of reasonable quality that are accessible on the open Internet" to train its AI music generator—a dataset of tens of millions of songs/recordings that, given its scope, necessarily includes Eight Mile Style's copyrighted Works. Indeed, publicly available sources, such as The Atlantic's AI Watchdog (first published September 2025, expanded to music search tools in June 2026), confirm that many of the Works appear in data sets known to be used by AI companies in the training of AI models. Publicly available sources also confirm that Suno accessed these Works from licensed streaming services (such as Spotify, YouTube, or SoundCloud) and paywalled platforms (e.g., Tidal), as well as others, including Jamendo (www.jamendo.com), Free Music Archive (freemusicarchive.org), and MusicBrainz (musicbrainz.org), by scraping and circumventing technological access controls—in part through the use of tools and services supplied by Bright Data (as further defined below). Eight Mile Style never authorized Suno to copy, reproduce, or otherwise use the Works for AI training or any other purpose.

6. Suno did so in a manner that completely disregards the rights of Eight Mile Style, and constitutes copyright infringement, and other unlawful conduct, by making unlicensed copies of the Works, as well as server copies, removing Copyright Management Information ("CMI"), and training the AI models themselves to disregard the CMI in both its training and output to conceal the infringement.

7. Suno took the Works and the sound recordings embodying them and trained its AI model so that its users, who number over one hundred million,[1] can create sound recordings based upon prompts. Suno operates on a "freemium" model allowing some free access, but charges users monthly subscription fees to fully use its platform, which AI-generated music files intended to recreate, mimic and/or emulate human-made songs that were captured illicitly and trained for such purpose.

8. Suno's users do not even have to write lyrics or melodies. No, armed with the illicit copies of millions of copyrighted works—including Eight Mile Style's Works—Suno's AI model can create an entire song, including the instrumentals, vocals, and entirely generated lyrics, all thanks to the training on these unlicensed copies of the Works in its library. That is, Suno made illicit copies of millions of copyrighted musical works, including Eight Mile Style's Works, and then—without a license or any remuneration to the rights holders—created a platform where anyone capable of paying $10 per month can create complete songs based entirely on these illicit copies. This is not speculation. Suno's Founder and CEO, Mikey Shulman, gave an interview admitting: "One of the biggest challenges in modeling music is just that a three minute song has so many data points in it that it is really difficult for models to accurately capture all of the interesting stuff there. Our models are taught to just continue a piece of music. And with that, and a little bit of extra sauce for getting these things to start properly, we can go from an idea in somebody's head, to an entire three minute song very easily."[2] That is, while Suno advertises itself as a completely generative AI music creation service that generates songs from whole cloth, its own CEO admits that it has just trained its models to "continue a piece of music"—that is, the music that Suno illegally scraped and copied to train its Model in disregard of the rights of the copyright holders allows Suno to create unlicensed derivative works thereof. Without the unlawful copying of Eight Mile Style's Works and ingestion into its AI models, Suno's service would be incapable of producing the product/service that has been used by

[1] https://www.musicbusinessworldwide.com/suno-is-far-beyond-2m-subscribers-and-300m-in-revenue-says-mikey-shulman-who-argues-its-good-that-ai-music-has-no-firm-rules-of-the-road-yet/

[2] "Suno Generates Beautiful Songs with Oracle Cloud". www.youtube.com/watch?v=aKlIQiS8MLc

more than 100 million people and netted it over 2 million paid subscribers.[3]

9. On November 2, 2026, Suno stated in a motion to dismiss court filing that: "[B]y design and in practice, Suno outputs do not 'sample' snippets of pre-existing music; they do not reprise specific melodies from songs someone else wrote; and they do not replicate the auditory characteristics of any real artist's voice to the point that someone would confuse a Suno creation with one actually sung by a particular famous musician." *Isbell, et al. v. Suno, Inc., et al.*, 1:26-cv-14005, ECF 30, at 1 (D. Mass Nov. 3, 2026) (Suno's Memorandum in Support of Motion to Dismiss). Suno also claimed that its model "ha[s] never allowed prompts for specific artists or copyrighted songs." *Id.* at 4 (quoting Mikey Shulman, *How We're Building the Future of Music Responsibly*, Suno (Aug. 6, 2026), https://suno.com/blog/building-the-future-of-music-responsibly).

10. Suno's representations to that court are demonstrably false. As discussed in more detail *infra* beginning at Paragraph 51, a brief investigation has uncovered Suno-generated outputs which use the copyrighted lyrics (often verbatim) and the protected musical elements of twenty-six (26) of the Works, many in the voice of Eminem, including, but not limited to, "Lose Yourself," "Till I Collapse," "The Real Slim Shady," "Houdini," "Stan," "Mockingbird," and "Without Me." Upon information and belief, there is infringing output for each of the Works. These Suno-created infringing works, and others, are attached hereto collectively as Exhibits B and C.

11. Suno has materially enjoyed the fruits of others' labor, closing its Series D round of financing in June 2026, raising over $400 million at a $5.4 billion valuation.[4] Indeed, Suno's business is generating hundreds of millions of dollars annually with projected revenue to reach $1 billion by 2028.[5]

12. Mr. Shulman's motivations are clear. Because, per Mr. Shulman, "[i]t's not really

---

[3] https://www.forbes.com/sites/conormurray/2026/02/26/ai-music-platform-suno-reaches-2-million-subscribers-as-industry-backlash-grows/

[4] Stassen, Murray, "Suno Raises Over $400 Million, Pushing Valuation to $5.4 Billion." Music Business Worldwide, <www.musicbusinessworldwide.com/ suno-raises-over-400-million-pushing-valuation-to-5-4-billion/> (last visited July 30, 2026).

[5] Kristin Robinson, Is Suno the Music Industry's Biggest Nightmare – Or Greatest Hope?, Billboard (Mar. 11, 2026) (available at https://www.billboard.com/pro/suno-ai-music-startup-cover-story/ (last visited Oct. 18, 2026)).

enjoyable to make music now,"[6] he decided to cut out human creation from the process. Mr. Shulman explained, "[w]e didn't just want to build a company that makes the current crop of creators 10 percent faster or makes it 10 percent easier to make music. If you want to impact the way a billion people experience music you have to build something for a billion people."[7] Said another way, Suno was never meant to be a tool for artists to create music but was instead always meant to replace the artists whose works were being unlawfully copied by directly reaching those artists' listeners with AI-generated substitutes which copy the originals.

13. Suno's investors knew from the beginning that they were funding a massive vehicle for copyright infringement with one investor calling the risk that labels and publishers would sue as just "the risk we had to underwrite when we invested in the company, because we're the fat wallet that will get sued right behind these guys… Honestly, if we had deals with the labels when this company got started, I probably wouldn't have invested in it. I think that they needed to make this product without the constraints."[8]

14. And, when the labels and publishers did, in fact, file suit, Suno agreed to settle with Warner Music Group to use its sound recordings as training data for generative AI models. Suno agreed to "deprecate[]"[9] its then-current models and launch the now-operable V6. Mr. Shulman commented on the settlement, "I don't think of what we did as a settlement. I think about this much more like a partnership . . . . It is much more long term."[10] Suno also reached an agreement with Bertelsmann Music Group ("BMG"). In a public statement Mr. Shulman made an about-face, no longer seeing partnerships with rightsholders as "constraints" but as a partnership that would

---

[6] 20VC Podcast with Harry Stebbings, *Mikey Shulman, CEO @Suno: The Future of Music, What is Gonna Happen?* at 23:01-23:16 (Jan. 10, 2025).

[7] *Id.*

[8] Brian Hiatt, *A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything*, Rolling Stone (Mar. 17, 2024) (available at https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/ (last visited Oct. 18, 2026)).

[9] Press Release, Warner Music Group, *Warner Music Group and Suno Forge Groundbreaking Partnership* (Nov. 25, 2025) (available at https://www.wmg.com/news/warner-music-group-and-suno-forge-groundbreaking-partnership (last visited Oct. 18, 2026)).

[10] Kristin Robinson, *Is Suno the Music Industry's Biggest Nightmare – Or Greatest Hope?*, Billboard (Mar. 11, 2026) (available at https://www.billboard.com/pro/suno-ai-music-startup-cover-story/ (last visited Oct. 18, 2026)).

"generate new revenue" for artists and songwriters, claiming to believe in "responsibly [] working directly with the people who make music and the companies that represent them." [11] Likewise, Suno has reached an agreement for a "strategic partnership" with Believe, a leading international digital music company, for it to provide its music as training data for Suno's models.[12] That is, now that it faces numerous lawsuits and challenges from rightsholders, Suno has all but admitted that there is a functioning market for licensing music and sound recordings for training data, that such licenses are part of "responsibly" creating AI models, and has essentially admitted to the unlawfulness of its conduct for all the music used to train its models that remains unlicensed—including Eight Mile Style's Works. Suno's business model was admittedly and clearly: infringe now, make billions by being the first mover, and try to settle on the cheap later. Seeking forgiveness is clearly more profitable than permission, which they obviously could have done but consciously chose not to do.

15. The reason for this about-face and sudden willingness to license is no surprise. Suno has lost every step of the way. Its motions to dismiss in other cases have been denied, and, on July 31, 2026, the Munich Regional Court in Germany ruled in a suit brought against Suno by Germany's music collecting society, GEMA, for identical conduct to that at issue in this case, that Suno infringed GEMA's copyrights by training its models on GEMA's songs in the U.S. (of which it stored entire works inside its models), and by reproducing them. Judge Elke Schwager noted that it was undisputed that Suno obtained the training data through stream-ripping, and Suno admitted it trained on GEMA's works without paying for them. Most importantly, the court ruled that Suno needed a license to GEMA's works under U.S. copyright law, *i.e.*, where the training physically happened. And finally, it granted GEMA an injunction and issued a disclosure order requiring Suno to disclose its revenue

---

[11] Press Release, BMG, *BMG and Suno Announce Global Strategic Alliance Advancing AI Music Opportunities And Revenue Streams* (Aug. 12, 2026) (available at https://www.bmg.com/news/bmg-and-suno-announce-global-strategic-alliance-advancing-ai-music-opportunities-and-revenue-streams (last visited Oct. 18, 2026)).

[12] Press Release, *Believe and Suno Announce Strategic Partnership to Advance Licensed AI Music Opportunities for Independent Artists and Labels*, Believe (Sept. 8, 2026) (available at https://www.believe.com/press-release/believe-and-suno-announce-strategic-partnership/ (last visited Oct. 18, 2026)).

tied to the infringed works.[13]

16. All irony lost, Mr. Shulman remarked about another pending lawsuit against Suno, "[i]t just seems silly to throw a bunch of venture dollars at lawyers instead of sitting down and talking about how you could work together." [14] However, at no point prior to launching any of its AI models did Suno "sit down" with anyone from Eight Mile Style, and this statement is belied by the investor statements, discussed ante, that prior to getting caught with its proverbial hands in the cookie jar, Suno felt that it didn't need the "constraints" of license agreements with the rightsholders. That is, Suno willfully infringed on millions of copyrights—including all of the Works in this case.

17. Bright Data Ltd., with its wholly-owned subsidiary, Bright Data, Inc. (collectively, "Bright Data"), provides data-scraping, proxy-network, and dataset services sold to customers including AI developers, such as, as relevant here, Suno. Bright Data develops, markets, and sells web-scraping infrastructure, residential and datacenter proxy networks, and pre-packaged datasets to business customers worldwide. Publicly available sources show that according to leaked source code from Suno, it used proxy services it acquired from Bright Data and scraped "millions of songs and lyrics" from YouTube Music, Deezer, and Genius.[15] In this leaked source code, there is a YouTube Music workflow that shows 2,057,486 artist records saved as output. For each artist, the code requests the artist's song playlist without a track limit. If there is no playlist identifier, it falls back to the song results already available. This shows a systematic effort to collect across artists' catalogs. Further, a separate Genius workflow records 6,980,653 successful song-page processing records confirming

---

[13] Virginie Berger, *Suno Loses Copyright Lawsuit To GEMA—AI Music Companies Should Worry*, Forbes (Aug. 5, 2026), https://www.forbes.com/sites/virginieberger/2026/08/05/suno-lost-to-gema-why-the-ruling-should-worry-ai-music-companies/ (also noting the suit filed by Koda, Denmark's music collecting society, against Suno over the same conduct). Further, the Society of Composers, Authors, and Music Publishers of Canada (SOCAN) filed suit in the Federal Court of Canada against Suno on September 2, 2026 for the same conduct. https://www.socan.com/socan-is-standing-up-for-music-creators-and-publishers-with-legal-action-against-suno-inc-for-unauthorized-use-of-music-in-generative-ai-platform/.

[14] Stuart Dredge, *Suno Boss Targets 'Bigger, Brighter Future' With Music Industry,* Music Ally (Jan. 14, 2025) (available at https://musically.com/2025/01/14/suno-boss-targets-bigger-brighter-future-with-music-industry/ (last visited Oct. 18, 2026)).

[15] Koebler, Jason, "Hack Reveals Suno AI Music Generator Scraped YouTube, Deezer, and Genius," 404 Media, <www.404media.co/hack-reveals-suno-ai-music-generator-scraped-youtube-deezer-and-genius/> (last visited July 30, 2026)

that not less than this number of extracted lyrics exist in Suno's code.

18. For example, publicly available sources have confirmed that Suno used Bright Data's services to scrape and incorporate into its training data files like "youtube_music" which includes over two million music clips of approximately 113,879 hours—the equivalent of thirteen ***years***—of music files scraped from YouTube.[16]

## III. The Parties

19. Plaintiff Eight Mile Style, LLC is a Michigan limited liability company with its principal place of business located at 1525 East Nine Mile Road, Ferndale, Michigan.

20. Plaintiff Martin Affiliated, LLC is a Michigan limited liability company with its principal place of business located at 1525 East Nine Mile Road, Ferndale, Michigan.

21. Eight Mile Style (collectively) owns and/or controls with the exclusive right to license the Works on Exhibit A and to initiate litigation on their behalf. Each Work listed in Exhibit A constitutes an original work or copyrightable subject matter under the Copyright Act, 17 U.S.C. section 101, *et seq.*, and has been registered with the U.S. Copyright Office as evidenced by the registration numbers listed therein. The copyrights for each of the Works in Exhibit A remain valid and subsisting, and have been owned and/or controlled by Eight Mile Style at all times relevant to the allegations in this Complaint.

22. Defendant Suno, Inc. is a Delaware corporation with its principal place of business at 17 Dunster Street, Cambridge, Massachusetts 02138. Suno develops, operates, and sells a generative AI music service that creates digital music based on user prompts. Suno charges users monthly subscription fees to use its platform, which produces AI-generated music files designed to mimic human-made songs.

## IV. Jurisdiction and Venue

23. This Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331 (federal question) and 1338(a) (copyright actions) because the claims alleged herein arise under the Copyright Act of 1976, 17 U.S.C. sections 101 *et seq.*, including the Digital Millennium Copyright Act,

---

[16] *See* note 15, *supra*.

17 U.S.C. sections 1201-1205.

24. This Court has personal jurisdiction over Defendant Suno because Suno has transacted business in this District, including offering and selling its AI music generation service to customers in California via the Internet; because Suno's infringing conduct has been directed at and caused harm in this District; because the infringing conduct occurred in this District given Suno's use of Oracle servers physically located in this District; because, on information and belief, it operates its business out of its offices located in this District; and because the exercise of personal jurisdiction over Suno comports with due process. Suno operates its business out of offices in Cambridge, Mass., New York, Los Angeles, and, more recently, San Francisco. It has been reported that Suno opened its San Francisco office in late March 2026 in SoMa ("South of Market" area). *See* S. Chen, *AI music generator Suno opens SF office* (April 3, 2026), Axios. According to that report, Suno's co-founder/CTO Georg Kucsko told Axios (via email) that opening doors in San Francisco "will be critical as we continue to scale" and that the company is "investing especially heavily in our machine learning team to develop our frontier music model").[17] Since that time, Suno has been actively recruiting employees to work in San Franciso office. *See* E. Tanaka, "AI Song Factory Suno Sneaks Into SoMa as San Francisco Tech Beat Kicks Back In," *Hoodline* (April 3, 2026) (noting at that time, "Local job listings point to an active recruitment drive for engineers, product designers and machine learning researchers based in San Francisco").[18] According to that report, many of the roles offered on Indeed "list San Francisco as the required location and note that some positions will be on site." *Id*. As of August 2026, job openings on Indeed include Lead Machine Learning Data Operations, Senior Director of Customer Experience, Senior Corporate Recruiter, Senior Counsel, Director of Accounting, and others.[19] In addition, Suno uses Oracle servers "to train its proprietary machine learning models and support growing demand for its next generation of generative music models." Oracle, *AI Innovators Flock to Oracle to Address Some of the World's Most Pressing Challenges*

---

[17] https://www.axios.com/local/san-francisco/2026/04/03/suno-ai-music-generator-startup-office-expansion

[18] https://hoodline.com/2026/04/ai-song-factory-suno-sneaks-into-soma-as-san-francisco-tech-beat-kicks-back-in/

[19] https://www.indeed.com/q-suno-l-san-francisco%2C-ca-jobs.html?vjk=34349af3bb314a9a

(March 18, 2024). According to publicly available sources, Oracle's servers are located in Virginia, Illinois, Phoenix, San Jose, CA (Northern District), as well as Mexico and Canada. According to other public sources, each of Suno's five fundraising rounds were pitched to and led by venture capital firms located in the Northern District—Seed round (Matrix Ventures, Cambridge/San Francisco); Series A round (Matrix Ventures, Cambridge/San Francisco); Series B round (Lightspeed Ventures, Menlo Park); Series C round (Menlo Ventures, Menlo Park); and Series D round (Bond Capital, San Francisco).

25. Venue is proper in this District under 28 U.S.C. sections 1391(b) and/or 1400 because Defendant Suno maintains an office in this District to, among other things, manage the training of its AI Models and the data servers on which they operate, and uses data servers located in the District through Oracle Cloud Infrastructure for that purpose – which includes hosting the illicit copies of the Works on these servers.

## V. Divisional Assignment

26. Pursuant to the Court's Assignment Plan (General Order No. 44), this action is an intellectual property action within the meaning of Local Rule 3-2(c) and therefore is not subject to intradistrict venue provisions.

## VI. Factual Background

### A. Eight Mile Style and Its Copyrights

27. Eight Mile Style is a leading independent music publisher that owns or exclusively controls copyrights with the exclusive right to license, and many other exclusive rights, the Works in Exhibit A. Eight Mile Style's catalogs include works by some of the most celebrated songwriters and recording artists in history. Each Work listed in Exhibit A constitutes an original Work of copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101, *et seq.*, and has been registered with the U.S. Copyright Office as evidenced by the registration numbers listed therein. The copyrights for each of the Works in Exhibit A remain valid and subsisting and have been owned and/or controlled by Eight Mile Style at all times relevant to the allegations in this Complaint.

28. Eight Mile Style knows that great music starts with great songwriting and masterful lyricists and composers and is committed to supporting and protecting the creative works its

songwriters have entrusted to it. As a publisher, Eight Mile Style regularly enters into licenses and other agreements for the Works, through which Eight Mile Style compensates its songwriters for their share of earnings. Eight Mile Style's songwriters rely on the income received from these transactions to support their livelihood and art. This system of licensing, permissions, and authorized use is the backbone of the music publishing industry and ensures that the songwriters and publishers who have invested their blood, sweat, tears, heartache, elation, and experience into their creative works receive compensation for the use of those Works.

29. U.S. copyright law simply does not let technology platforms like Suno ride roughshod over these constitutionally mandated protections of creative expression. Indeed, copyright owners necessarily have the right to police the use of their copyrighted works. "The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property." *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 997 (C.D. Cal. 2006) ("The right to exclude is inherent in the grant of a copyright; a copyright is not improperly expanded simply because the owner has exercised his or her power to exclude."). These are age-old, hornbook copyright principles. Defendant simply ignored them.

30. Eight Mile Style, its songwriters, and its artists, rely on U.S. copyright law to protect their Works from infringement. Without such protections, the music publishing industry would not function because songwriters and artists would be unable to profit from their work, and because publishers like Eight Mile Style and record companies who develop recording artists would lack the financial ability and incentive to invest in the careers and promote the works of their songwriters/artists.

31. Eight Mile Style generates revenue from its catalog by licensing the Works for use in recordings, live performances, synchronization placements in films, television programs, and advertisements, mechanical reproductions, print, digital transmissions, and streaming. The value of these licensing activities depends entirely on Eight Mile Style's ability to enforce its exclusive right to authorize—or decline to authorize—the reproduction, distribution, and public performance of its copyrighted Works. Defendant's conduct directly undermines and dilutes that exclusivity.

32. One way Eight Mile Style exploits the Works is to grant licenses for the display of the copyrighted lyrics of its Works. These licenses require that the licensee provide the corresponding song title, songwriter(s), and other identifying information for the Works—*i.e.* the CMI. The display of the CMI is essential for informing consumers about the authors of musical works, ensuring credit is given to creators, maintaining copyright protections, ***and*** directing other putative licensees to Eight Mile Style. Any removal or alteration of CMI by unlicensed parties violates these rights and harms the interests of Eight Mile Style and its songwriters. It also violates the law.

**B. Suno's Infringing Conduct**

**(i) Suno unlawfully scraped data from the internet, including Eight Mile Style's Works.**

33. Suno operates a subscription-based generative AI platform that generates new songs and audio recordings in response to user text prompts. Suno became widely available starting with version 3 on March 24, 2024, version 5.5 launched in March 2026, and version 6 launched September 9, 2026.

34. Suno's AI model was trained on a corpus of recorded music that, by Suno's own admission in separate litigation, encompasses substantially all available commercial recordings of adequate fidelity. In its answer to the complaint in *UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-11611-FDS (D. Mass.), Suno stated that its "training data includes essentially all music files of reasonable quality that are accessible on the open Internet, abiding by paywalls, password protections, and the like."

35. Eight Mile Style's Works are among the most widely distributed musical works on licensed streaming services. Given Suno's self-described training methodology—which involved harvesting effectively all available recordings—it is a near certainty that Eight Mile Style's Works were copied into Suno's training sets. Eight Mile Style's Works are available on Spotify, Apple Music, YouTube, Amazon Music, SoundCloud, and Tidal, among others, all of which are duly licensed by Eight Mile Style and require some form of account registration, subscription, or other access credentials to use.

36. Upon information and belief, Suno obtained copies of the Works by accessing these

platforms through automated scraping tools that bypassed login requirements, subscription gates, and technical anti-bot defenses—in part through tools and proxy services supplied by Bright Data. Suno then ingested these unauthorized copies into its training pipeline, producing an AI model capable of generating audio that closely imitates the style, structure, and expressive character of the copyrighted recordings on which it was trained.

37. Specifically, with respect to its scraping of YouTube Music, Suno illicitly used a notorious method of music piracy known as "stream ripping" to download millions of songs. While YouTube allows users to stream content (playing it as received), it is not designed to allow and instead prohibits making permanent, unrestricted copies of the content it streams. In this regard, YouTube's Terms of Service generally prohibit the unauthorized use of recordings available on its platform.

38. Moreover, YouTube employs enhanced technological measures to protect against unauthorized downloading and copying of licensed content, including Eight Mile Style's Works. Specifically, YouTube employs a "rolling cipher" encryption measure to control access to such content, preventing external sites or services from directly downloading protected media files. YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing algorithm (the "rolling cipher") that is designed to impede external access to the underlying YouTube video files, thereby preventing or inhibiting any downloading, copying, or distribution of the videos. Upon information and belief, the video player on the page URL must decrypt or descramble the file URL to locate and play the underlying audiovisual file.

39. Although YouTube revises the rolling cipher by design, there are illicit tools and services that circumvent the encryption, download audiovisual content available on YouTube, and create copies that can be downloaded and further distributed by users without restriction. This process is commonly known as scraping or "stream ripping."

40. Upon information and belief, Suno used such stream ripping tools—specifically, tools known as YT-DL and YT-DLP, to circumvent YouTube's encryption and scrape copyrighted recordings from YouTube. This stream-ripping is the key means by which Suno engages in its first

infringing act of reproducing the Works.

41. Suno's scraping was made public on or about September 2, 2025, after the ICMP shared evidence with Billboard, in particular private datasets that demonstrate the illegal scraping of copyrighted sound recordings from YouTube by Suno. Suno's scraping of the Internet and ingestion of this content violates the Copyright Act and constitutes infringement of the Works, and other illegal activity discussed below.

**(ii) Suno utilized Bright Data's technology products to assist in its scraping of copyrighted materials from the internet and to remove CMI from these materials.**

42. Bright Data is a commercial vendor of web-scraping infrastructure whose business model is built on enabling customers to extract data from websites at scale—including websites that employ technical measures to prevent exactly that kind of bulk automated extraction. Bright Data's product suite includes residential and datacenter proxy networks that rotate IP addresses to evade rate limits and IP bans; a "Web Unlocker" service designed to defeat CAPTCHAs, JavaScript challenges, and bot-detection systems; and a "Scraping Browser" that renders pages in a browser environment without the headers and footers to circumvent client-side protections.

43. As discussed above, CMI regularly exists in the headers and footers of files containing musical works. Making the deliberate choice to exclude headers and footers is identical to making the deliberate choice to remove CMI from these files. Suno thus extracted musical recordings from various above-alleged sources on the Internet and stripped the CMI from the entirety of these files, which includes the CMI attributable to the Works.

44. Upon information and belief, Bright Data's tools and services were used by Suno to extract the Works from Eight Mile Style's licensees. This extraction required circumventing the technological protection measures those platforms employ: authentication gates, subscription paywalls, rate limiting, CAPTCHA challenges, and robots.txt access restrictions, as well as removal of CMI.

**(iii) Suno's Outputs also constitute copyright infringement of Eight Mile Style's Works.**

45. As discussed above, Suno's Founder and CEO, Mikey Shulman, admitted that the model faces "challenges in modeling music" and "our models are taught to just continue a piece of music."[20]

46. Many outside observers drew the obvious conclusion that Suno's model, however, was clearly trained on copyrighted music. A few examples follow:

- "Though neither company will directly confirm or deny it, there is substantial reason to believe that . . . Suno . . . w[as] trained on copyrighted music, without permission[.]" Brian Hiatt, *AI-Music Arms Race: Meet Udio, the Other ChatGPT for Music*, Rolling Stone (Apr. 10, 2024).
- "While details about the data that trained these AI tools are sparce, there is plenty of reason to believe that they are trained on copyrighted music." Sharon Goldman, *AI Music May be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024).
- "Although Suno hasn't revealed what music has been used to train its music-generation models, it seems almost certain that the startup has used materials without the explicit consent of their creators. For one thing, many of its musical outputs are somewhat similar to popular songs." Mike Wheatley, *Generative AI Music Maker Startup Suno Raises $125M in Funding*, SiliconAngle (May 21, 2024).
- "To create music as convincing as some of the examples generated by Suno and other platforms using AI algorithms means training those algorithms on existing music, and lots of it. And that's where copyright comes into play, because it's become plainly obvious that many AI models have been built by ingesting enormous quantities of copyrighted material." Daniel Tencer, *Suno Could Get Sued By The Record Business. Who's Backing it With $125M?*, Music Business Worldwide (May 28, 2024).

47. Suno never sought or obtained a license from Eight Mile Style to reproduce, copy, or train on any particular composition in Eight Mile Style's catalog, much less for all of its Works.

[20] "Suno Generates Beautiful Songs with Oracle Cloud". www.youtube.com/watch?v=aKlIQiS8MLc

Suno's training-data practices constitute direct copyright infringement on a massive scale.

48. While Suno claims to have put in guardrails to prevent output that is like existing artists, these guardrails are easily circumvented. For example, while, currently, the platform will not permit a user to include "Reba McEntire" in the prompt, it will allow users to include the prompt "in the style of Reba McIntyre [sic]" in creating a female-vocal country song in McEntire's style. Indeed, third-party applications like "HookGenius" are advertising services to get around these guardrails—including specifically for Eminem—by providing users artist-specific prompts for Suno to generate entire albums based on the users' favorite artists.[21]

///

///

///

///

///

///

[21] *See* https://hookgenius.app/learn/suno-eminem-style/ and https://hookgenius.app/pricing/

49. Specifically, "HookGenius" provides that if you buy the $29 "Suno Mastery Guide" it can help users to create: "Eminem-style prompts for Suno – aggressive rapid-fire delivery, dense internal rhymes, vivid storytelling over tense production."[22] It then provides sample injection prompts to create Eminem-style songs:

**TL;DR**

- Slim Shady: aggressive rap, dark humor, rapid-fire flow, controversial
- Recovery era: emotional rap-rock, anthemic, powerful, stadium-ready
- Storytelling: narrative rap, vivid imagery, complex rhyme schemes, raw

Eminem revolutionized rap with his technical virtuosity, storytelling ability, and willingness to push boundaries. His flow ranges from rapid-fire syllable stacking to emotional narrative delivery, often backed by rock-influenced production. These prompts capture his intensity and range.

## Which Eminem-style Suno prompts work best?

SLIM SHADY AGGRESSIVE

```
aggressive rap, rapid-fire flow, dark humor, male rapper, horrorcore, intense beat, bass-heavy, menacing, controversial
```

RECOVERY ANTHEMIC

```
rap-rock, anthemic, powerful male rap vocals, emotional, stadium-ready, guitar-driven, inspirational, intense, building energy
```

STORYTELLING NARRATIVE

```
narrative rap, storytelling, vivid imagery, male rapper, emotional, piano-driven beat, raw, personal, complex rhyme schemes
```

LOSE YOURSELF ENERGY

```
motivational rap, intense, driving guitar riff, powerful male rap, urgent, raw energy, building tension, anthemic chorus
```

TECHNICAL CHOPPY FLOW

```
technical rap, choppy fast flow, complex wordplay, male rapper, syncopated delivery, aggressive beat, intricate, relentless
```

[22] *Id.*




50. HookGenius creates prompts for users to copy and paste into Suno. For example, when asked for a "Lose-Yourself-Era Eminem track" HookGenius created a prompt that could be directly copied and pasted into Suno for a song titled "One Clean Take" complete with lyrics and a style prompt. Suno does the rest:



51. Also, Suno has entered into paid affiliate relationships with a number of Suno content creators, providing them with a commissioned referral link in exchange for producing tutorial content that drives paid subscriptions. One creator's affiliate-linked tutorial expressly describes Suno's practice of flagging and rejecting prompts that reference "a specific band name or artist," and is devoted entirely to teaching viewers, in his own words, how to "get around" that restriction "and still have it produce a track that sounds similar to that artist." The same creator sells a paid catalog of prompts marketed as "Suno-ready" for generating music resembling a specific, named musical act.[23] Suno is paying people to teach others how to get around its own guardrails in order to drive traffic and purchases of paid subscriptions.

52. Further, despite previous protestations that Suno did not merely regurgitate pre-existing content and rejecting prompts that use artists' names, Suno V6 (the most recent version) now accepts these requests and "redirect[s]" them "toward descriptive musical characteristics" that Suno attributes to that artist.[24] That is, Mr. Shulman, Suno's CEO, is admitting that Suno was always designed to model after pre-existing works, but it was not until Suno concluded that its users wanted to use artist-specific prompts that it made the business decision to facilitate the creation of facsimiles of copyrighted works—including the Works. Suno was just withholding this capability until it found a way to market it.

---

[23] Jamie Aplin, *How to sound like a specific Artist in Suno (without using their name)*, YouTube, at 0:15 (uploaded February 15, 2026), https://www.youtube.com/watch?v=3DiaXhCcYZE (despite being a tutorial on how to get around Suno's guardrails, the content creator states "I've actually had Suno reach out to me...they offered me an affiliate link and I'm now using that. So, if you're watching this video and you haven't yet signed up for one of the paid versions of Suno, go ahead and do that. It's going to support this channel so I can keep creating these tutorials to hopefully help you make better song creations with that platform."); *see id.* at 1:44, 15:38.

[24] Mikey Shulman, *How We're Building the Future of Music Responsibly*, Suno (Aug. 6, 2026) (available at https://suno.com/blog/building-the-future-of-music-responsibly (last visited Oct. 18, 20a26)).

53. At a user's request, Suno recreates the Works it was obviously trained on and creates infringing derivative works. For example, Suno created the track "Slim shady x Rosefalls" for the user: Rosefallsローズ・フォールズ with this cover art and a voice clearly derived from Eminem's actual voice.[25]




///

///

///

///

///

///

---

[25] https://suno.com/song/4baa88ab-2f05-4604-90d6-5c6d7ab686bc (and attached as part of Collective Exhibit B, Ex. B-1) (archived at https://tinyurl.com/42jx4sus)

54. For user "NEVERtoldVeryLies," Suno "created" the track "Lose Yourself By Eminem" which copies, verbatim, the lyrics of "Lose Yourself."[26] Below is a comparison of the Lyrics from the Intro, Verse 1, and Chorus of the Suno track and the Original Work.

**"Lose Yourself" (the Work)**

[Intro]
Look, if you had one shot or one opportunity
To seize everything you ever wanted in one moment
Would you capture it or just let it slip? Yo

[Verse 1]
His palms are sweaty, knees weak, arms are heavy
There's vomit on his sweater already, mom's spaghetti
He's nervous, but on the surface, he looks calm and ready
To drop bombs, but he keeps on forgetting
What he wrote down, the whole crowd goes so loud
He opens his mouth, but the words won't come out
He's chokin', how? Everybody's jokin' now
The clock's run out, time's up, over, blaow
Snap back to reality, ope, there goes gravity
Ope, there goes Rabbit, he choked, he's so mad
But he won't give up that easy, no, he won't have it
He knows his whole back's to these ropes, it don't matter
He's dope, he knows that, but he's broke, he's so stagnant
He knows when he goes back to this mobile home, that's when it's
Back to the lab again, yo, this old rhapsody
Better go capture this moment and hope it don't pass him

[Chorus]
You better lose yourself in the music
The moment, you own it, you better never let it go (Go)
You only get one shot, do not miss your chance to blow
This opportunity comes once in a lifetime, yo
You better lose yourself in the music
The moment, you own it, you better never let it go (Go)
You only get one shot, do not miss your chance to blow
This opportunity comes once in a lifetime, yo
You better

**"Lose Yourself By Eminem" (Suno Track)**

[Intro]
Look, if you had one shot or one opportunity
To seize everything you ever wanted in one moment
Would you capture it, or just let it slip? Yo

[Verse 1]
His palms are sweaty, knees weak, arms are heavy
There's vomit on his sweater already, mom's spaghetti
He's nervous, but on the surface he looks calm and ready
To drop bombs, but he keeps on forgetting
What he wrote down, the whole crowd goes so loud
He opens his mouth, but the words won't come out
He's choking, how? Everybody's joking now
The clock's run out, time's up, over—blaow!
Snap back to reality, ope there goes gravity, ope
There goes Rabbit, he choked, he's so mad but he won't
Give up that easy, no, he won't have it, he knows
His whole back's to these ropes, it don't matter, he's dope
He knows that but he's broke, he's so stagnant, he knows
When he goes back to this mobile home, that's when it's
Back to the lab again yo, this whole rhapsody
Better go capture this moment and hope it don't pass him, and

[Chorus]
You better lose yourself in the music
The moment, you own it, you better never let it go (Go!)
You only get one shot, do not miss your chance to blow
This opportunity comes once in a lifetime, yo
You better lose yourself in the music
The moment, you own it, you better never let it go (Go!)
You only get one shot, do not miss your chance to blow
This opportunity comes once in a lifetime, yo
You better…

[26] https://suno.com/song/c66e3755-dd5b-45f1-a3ef-4582d03e1ab1?sh=UCaV01zd3ZSQGvv3 (and attached as part of Collective Exhibit B, Ex. B-2) (archived at https://tinyurl.com/42jx4sus)

55. For another user, "Greg Wes Records," Suno created an infringing copy of "Till I Collapse" which clearly infringes the Work of the same name.[27] Below are the Verse and Chorus of the Infringing "Till I Collapse" and the Work "Till I Collapse:"

**"Till I Collapse" (Original Work)**

[Verse 1: Eminem]
'Til I collapse, I'm spillin' these raps long as you feel 'em
'Til the day that I drop, you'll never say that I'm not killin' 'em
'Cause when I am not, then I'ma stop pennin' 'em
And I am not hip-hop and I'm just not Eminem
Subliminal thoughts, when I'ma stop sendin' 'em?
Women are caught in webs, spin 'em and hock venom
Adrenaline shots of penicillin could not get the illin' to stop
Amoxicillin's just not real enough
The criminal, cop-killin', hip-hop villain
A minimal swap to cop millions of Pac listeners
You're comin' with me, feel it or not
You're gonna fear it like I showed ya the spirit of God lives in us
You hear it a lot, lyrics to shock
Is it a miracle or am I just product of pop fizzin' up?
Fa' shizzle, my wizzle, this is the plot, listen up
You bizzles forgot, Slizzle does not give a fuck

[Chorus: Nate Dogg & Eminem]
'Til the roof comes off, 'til the lights go out
'Til my legs give out, can't shut my mouth
'Til the smoke clears out, am I high? Perhaps
I'ma rip this shit 'til my bones collapse
'Til the roof comes off, 'til the lights go out ('Til the roof, until the roof)
'Til my legs give out, can't shut my mouth (The roof comes off, the roof comes off)
'Til the smoke clears out, am I high? Perhaps ('Til my legs, until my legs)
I'ma rip this shit 'til my bones collapse (Give out from underneath me)

**"Till I Collapse" (Suno)**

[Verse 1: Eminem]
'Til I collapse, I'm spillin' these raps long as you feel 'em
'Til the day that I drop, you'll never say that I'm not killin' 'em
'Cause when I am not, then I'ma stop pennin' 'em
And I am not hip-hop and I'm just not Eminem
Subliminal thoughts, when I'ma stop sendin' 'em?
Women are caught in webs, spin 'em and hock venom
Adrenaline shots of penicillin could not get the illin' to stop
Amoxicillin's just not real enough
The criminal, cop-killin', hip-hop villain
A minimal swap to cop millions of Pac listeners
You're comin' with me, feel it or not
You're gonna fear it like I showed ya the spirit of God lives in us
You hear it a lot, lyrics to shock
Is it a miracle or am I just product of pop fizzin' up?
Fa' shizzle, my wizzle, this is the plot, listen up
You bizzles forgot, Slizzle does not give a fuck

[Chorus: Nate Dogg & Eminem]
'Til the roof comes off, 'til the lights go out
'Til my legs give out, can't shut my mouth
'Til the smoke clears out, am I high? Perhaps
I'ma rip this shit 'til my bones collapse
'Til the roof comes off, 'til the lights go out ('Til the roof, until the roof)
'Til my legs give out, can't shut my mouth (The roof comes off, the roof comes off)
'Til the smoke clears out, am I high? Perhaps ('Til my legs, until my legs)
I'ma rip this shit 'til my bones collapse (Give out from underneath me)

---

[27] https://suno.com/song/42f6830a-7767-4040-888c-f0b6e9499108 (and attached as part of Collective Exhibit B, Ex. B-3) (archived at https://tinyurl.com/42jx4sus)

56. For user "Greg Wes Records," Suno "created" the songs which verbatim copy the lyrics of "The Real Slim Shady"[28] and "Houdini."[29]

57. And Suno created for users "Illume"[30] and "IndomitableFire"[31] infringing versions of "Ass like That," both of which likewise use the lyrics verbatim of that Work.

58. Further, Eight Mile Style has found one hundred and eight (108) ***more*** Suno-created infringing outputs that make use of the copyrighted lyrics and/or copyrighted musical elements of the following twenty-six of the works made public by Suno users: "8 Mile," "Ass Like That," "Brain Damage," "Doomsday Pt. 2," "Drama Setter," "Evil Deeds," "Hailie's Song," "High All the Time," "Houdini," "I'm Back," " Kill You," "Lose Yourself," "Many Men," "Mockingbird," "Mosh," "Purple Pills," "Role Model," "Smack That," "Soldier," "Stan," "Superman," "The Real Slim Shady," "Thugs Get Lonely Too," "Till I Collapse," "Toy Soldiers," and "Without Me." Copies of these 108 infringing Suno outputs are attached hereto as Collective Exhibit C, lodged with the Court, and available publicly at: https://tinyurl.com/6298e65s.

59. Upon information and belief, this is just the tip of the iceberg, and infringing outputs for each Work have been made by Suno.

60. Further, Suno (including the most recent V6) is trained from user-uploads without appropriate safeguards to prevent users from uploading copyrighted lyrics and music. For example, Suno has allowed user uploads since 2024,[32] but stated that copyrighted uploads would be blocked.[33] However, Suno has since announced new safeguards for audio and lyrics for V6.[34] The announcement of new safeguards is at least a tacit admission that the previous safeguards were not effective enough

---

[28] https://suno.com/song/a60b0dd5-b11e-47d6-8f44-1447fa26ecf6 (and attached as part of Collective Exhibit B, Ex. B-4) (archived at https://tinyurl.com/42jx4sus)

[29] https://suno.com/s/cYBn7Fyk0ywVKWHR (and attached as part of Collective Exhibit B, Ex. B-5) (archived at https://tinyurl.com/42jx4sus)

[30] https://suno.com/song/202175e8-a087-4469-8502-4bb858f003fe (and attached as part of Collective Exhibit B, Ex. B-6) (archived at https://tinyurl.com/42jx4sus)

[31] https://suno.com/song/3cbbe799-65ca-4281-ba75-69a897cfd03b (and attached as part of Collective Exhibit B, Ex. B-7) (archived at https://tinyurl.com/42jx4sus)

[32] https://suno.com/release-notes/audio-inputs-for-everyone (last visited Oct. 18, 2026).

[33] https://blog.suno.com/blog/audio-inputs (last visited Oct. 19, 2026).

[34] https://suno.com/blog/introducing-v6 (last visited Oct. 19, 2026).

to prevent copyright infringement regarding output. The Suno terms and conditions grant Suno a "perpetual, irrevocable" license to train on all user-uploaded content.[35] As such, Suno is clearly training its models on user submissions, including copyrighted works and the Works.

61. For example, Suno created, for user, "HACKER JACK!" a song called "Im [sic] cleaning out my conscious" where the prompt was "emenem [sic] im [sic] cleaning out my closet".[36]

62. There is further evidence that Suno's guardrails cannot prevent copyright infringement. Suno's platform generates songs and lyrics based on user prompts. For example, when asked to "give me a Miles Davis like Blues track with horns and a quartet" Suno generated two lyric-less tracks both named "Blue Note Quartet" that are clearly inspired by and are unlicensed derivative works of Miles Davis.

63. Even after these guardrails were implemented, similarly situated plaintiffs have been able to generate infringing works from Suno. *See Round Hill Music LP, et al. v. Suno, Inc.*, Case No. 3:26-CV-8507-RFL (N.D. Cal.), ECF 45 at ¶ 51 (filed Oct. 19, 2026) (discussing the infringing output from Suno lifting nearly verbatim the lyrics of "I Got You (I Feel Good)" by James Brown); *id.* at ¶ 55 (discussing how two works at issue in that case are in Suno's demo files); *Gerencia 360 Music, Inc. v. Suno, Inc.*, Case No. 3:26-cv-09248-RFL (N.D. Cal.), ECF 41 at ¶ 48 (Filed Oct. 18, 2026) (discussing the infringing output from Suno based on English-translation lyrics of "Quince Besos" as performed by Cornelio Vega y Su Dinastia).

64. This is evidence that Suno creates unlicensed derivative works. And, under the terms of service, Suno trains its models on information submitted by users despite the guardrails.

65. Suno has thus structured its AI models to generate AI music designed to mirror the very copyrighted songs it trains on, for which the above and below alleged outputs are but a few examples. Suno has thereby created AI models that deliver outputs which are verbatim copies, strikingly similar, or at minimum substantially similar to the Works. Indeed, this is proven by the

[35] https://www.musicbusinessworldwide.com/suno-v6-ai-music-models-launch-in-partnership-with-wmg-bmg-and-believe/ (last visited Oct. 19, 2026).
[36] https://suno.com/song/ceff6299-2e8e-4cc6-8350-d8a290932cd8 (and attached as part of Collective Exhibit B, Ex. B-8) (archived at https://tinyurl.com/42jx4sus)

outputs identified in Exhibits B and C, and independent sources have repeatedly identified instances where Suno's outputs are not merely in the style of existing works but contain verbatim or near-verbatim excerpts of pre-existing songs, including outputs that imitate the voices of the artists performing on those songs. On information and belief, this is true of each of the Works in this action.

66. These outputs include reproductions of melodies, lyrics, instrumentals, and even full passages indistinguishable from the originals. For example, Suno has output 'producer tags' which are an integral musical part of songs throughout the hip-hop and rap genres, and function as a type of signature for a producer.

67. Upon information and belief, Suno claims that its AI models can produce "radio-quality music," and has encouraged users to post their outputs to "platforms expressly designed to commercialize music." [37] Suno thus not only ingested the Works into its AI models to train them, but also with the explicit purpose of imitating the expressive features of the Works in digital music files that serve as substitutes for and compete with the original Works.

68. Indeed, a since-deleted X (formerly Twitter) post from C.C. Gong, a (now-former) principal of Suno's lead investor, Menlo Ventures, all but confirmed that she saw the value in replacing streaming human-created music with that created by Suno. Said Gong, "What's remarkable isn't that Suno makes music generation easy. It's that it's changing the default relationship people have with music. Cultivation improves consumption. For decades, we listened to what artists ("record labels) [sic] released. Now, anyone can create exactly what they want to hear instantly. I've personally shifted most of my listening to Suno. I was so tired of Spotify giving me the same overplayed recommendations. When everyone can create, the catalog becomes infinite and music becomes more personalized. Instead of competing for mainstream hits, AI unlocks an ever-expanding long tail, meaning everyone can find their song, not just a song."[38]

69. In GEMA's case against Suno mentioned above, GEMA's lawyers were able to reproduce songs like "Daddy Cool" by Boney M. and "Mambo No. 5" almost note for note by

---

[37] *UMG Recordings, Inc. et al v. Suno, Inc.*, et al., Case No. 1:24-cv-11611-FDS, DKT 277, at p. 27, ¶ 74 (D. Mass Aug. 25, 2026))

[38] *See* https://x.com/ednewtonrex/status/2027156245858189390;

prompting Suno with the lyrics, a style, and a title.[39]

70. Plaintiffs in other cases have identified other examples of Suno-generated songs which infringe others' musical copyrights. For example, Plaintiffs in *UMG Recordings, Inc. et al. v. Suno, Inc.* No. 1:24-cv-11611 (D. Mass. June 24, 2024), ECF 1 (the "UMG Complaint"), at pp. 16-18, alleged that Suno's AI model generated music indistinguishable from Chuck Berry's classic "Johnny B. Goode" song, not just once, but twenty-seven (27) times. These Suno generated outputs appear to copy the essential and immediately recognizable melodies and arrangements of the original song.

71. The UMG Complaint also alleges that Suno's AI model generated ten (10) different outputs that resemble Bill Haley & His Comets' song "Rock Around the Clock." The Suno output contains four (4) lines at the beginning that are very similar to the original, with identical pitches and rhythm in many places. It also uses a melody later in the output on the phrase, "we're gonna rock around the clock tonight," which is virtually identical to the melody of the original. *Id*., Paragraph 56 at 19.

72. The UMG Complaint further alleges Suno generated a song similar to Jerry Lee Lewis' song, "Great Balls of Fire," including ten (10) different outputs that contain a famous melody in this song. One such output includes the recognizable characteristic large vocal leap up to the word "great" in the line, "goodness, gracious, great balls of fire." This line also replicates and follows the rhythm of the original and follows a similar melodic shape. *Id.*, Paragraph 59 at 21.

73. UMG also claims that Suno's AI model generated six (6) different outputs that contain portions of B.B. King's famous song, "The Thrill is Gone." The first phrase in the output, "the thrill is gone," uses identical pitches to those used in the third occurrence of this phrase in the original sound recording. The second phrase, "the thrill has gone away," is also very similar to the same phrase in the original. *Id.*, Paragraphs 60-61, at pp. 21-22.

74. Suno's AI model also generated eleven (11) additional outputs resembling "Sway." *Id*., Paragraph 61 at p. 22.

---

[39] Virginie Berger, Suno Loses Copyright Lawsuit To GEMA—AI Music Companies Should Worry, Forbes (Aug. 5, 2026), https://www.forbes.com/sites/virginieberger/2026/08/05/suno-lost-to-gema-why-the-ruling-should-worry-ai-music-companies/.

75. Not only has Suno generated infringing outputs and made them available to the public, on information and belief, Suno has taken steps that prevent rights holders from discovering the true extent of the infringing outputs by quietly removing lyric search (the ability for users to "search for lyrics…and find the song") less than one year after it was launched, and only weeks after news broke that Suno's lyric-generating AI model "ReMi" could, "with very little effort," be made to "generate 'full song' lyrics."

76. Indeed, Suno has claimed that over 10 million people have already created digital music files using its AI services as of 2024.[40]

77. As of November 2025, Suno users were generating about 7 million songs **per day**, and as of February 26, 2026, as mentioned above, Mr. Shulman claimed that more than 100 million people have used Suno, and that it has over 2 million paid subscribers and $300 million in annual revenue.[41] Upon information and belief, these digital music files have been released to the public, including on major streaming services, and thus they not only compete with the copyrighted sound recordings that enabled their creation for which Suno did not seek or obtain permission to use, they dilute the royalty pools from which the Works would be paid under a license. Moreover, and as discussed above, discovery will undoubtedly show that Suno created additional outputs which infringe upon all the Works, and are either verbatim copies, strikingly similar, or substantially similar.

### C. Harm to Eight Mile Style

78. Defendant's unlawful infringing conduct has caused and continues to cause harm to Eight Mile Style and the songwriters and artists it represents (and/or whose works it owns).

79. The Eight Mile Style Works are world-famous works—the very kind of artistic expressions that the Copyright Act is designed to protect in fulfillment of the Constitutional mandate.

80. Without a single penny of remuneration—much less even a request for license—Defendant Suno, a massive, for-profit company, has engaged in rampant commercial copying,

---

[40] Mikey Shulman, *Suno Has Raised $125 Million to Build a Future Where Anyone Can Make Music*, Suno Blog (May 21, 2024), https://suno.com/blog/fundraising-announcements-may-2024.

[41] https://www.forbes.com/sites/conormurray/2026/02/26/ai-music-platform-suno-reaches-2-million-subscribers-as-industry-backlash-grows/

unauthorized access, and removal of CMI. This has harmed Eight Mile Style by, *inter alia*, devaluing its catalog, diverting compensation away from Eight Mile Style, precluding licensing opportunities, and divesting Eight Mile Style of commercial control over these Works. In short, it infringes upon just about every one of Eight Mile Style's exclusive rights as the copyright owner of the Works.

81. Meanwhile, Defendant has amassed a fortune by circumventing the protections afforded to Eight Mile Style by the Copyright Act. Without the use of Works such as those owned, controlled, or represented by Eight Mile Style, Suno would have no business.

82. Thus, while simultaneously holding itself out to be a "responsible" company, Suno has been knowingly and intentionally committing willful copyright infringement from inception of its AI models.

**D. Fair Use Does Not Apply**

83. As this Court in *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1030-34 (N.D. Cal. June 23, 2025) ("*Bartz I*") determined following discovery, the practice of indefinite retention in a general-purpose archive is legally distinct from the narrower act of purchasing and scanning works solely to train a specific model. Suno has engaged in the same conduct, and the indefinite retention of unlicensed copies of copyrighted works, under *Bartz I*, does not constitute fair use. Building and maintaining a permanent stockpile of copyrighted material for open-ended future exploitation fails every factor of the fair-use analysis: the purpose is acquisitive rather than transformative; entire works are retained without limitation; and the unauthorized copies function as market substitutes, displacing sales and licenses on a one-to-one basis. This Court did not mince words when it rejected any suggestion that the Copyright Act contains a technology-sector exception to these well-established principles. *Id.* at 1022 ("Anthropic [another AI company] seems to believe that because some of the works it copied were sometimes used in training LLMs,[42] Anthropic was entitled to take for free all the works in the world and keep them forever with no further accounting. **There is no carveout, however, from the Copyright Act for AI companies.**") (emphasis added).

84. The three Major North American Performance Rights Organizations ("PRO"),

[42] An LLM, or "Large Language Model," is a type of artificial intelligence program trained on massive amounts of text to recognize, translate, summarize, and generate human-like language.

ASCAP, BMI, and SESAC, released a joint statement on October 28, 2025, stating, "While an increasing number of AI tools are training their models in an ethically responsible manner that respects the rights of human creators, **the three PROs emphasized their firm position that AI technology companies ingesting and training models on copyrighted musical works without permission from, compensation for or credit to creators is not fair use, but theft**."[43] (emphasis added). BMI has also stated that it "does not accept registrations for works that are generated entirely by AI using only text prompts, without meaningful human creative contribution. Even if multiple prompts are used to refine the output, the resulting work is considered fully AI-generated and is not currently eligible for copyright registration. This distinction ensures that BMI registrations reflect works with substantial human authorship, in alignment with current guidance from the U.S. Copyright Office" specifically identifying "platforms like Suno or Udio to enter test prompts and generate complete songs without adding original human-created lyrics, melodies, or instrumentation."[44]

85. While in other cases for copyright infringement, Suno has waxed poetic about the necessity of progress and AI's value to society, there is simply no reason—other than expediency—to have that progress come at the cost of copyrights holders. Indeed, even accepting *arguendo* the procedural hurdles for ensuring proper licensing for the size of data needed for an effective AI model, there exists an entire universe of public domain and non-copyrighted materials with which to train the models. For example, literally every (formerly) copyrighted work under U.S. Copyright law written before 1931 (1926 for sound recordings) has now entered the public domain.

86. Furthermore, these "expediency" arguments completely falter when compared to the $5.4 billion valuation that Suno has garnered exploiting illicit copies of copyrighted works, including the Works. The Works were created over periods of dozens of years, and Suno, by its infringing conduct, is destroying the value of these works in a matter of a few years with only profit as its motive. By comparison, there are AI companies and collective rights organizations who seek permission and pay rights holders to create data sets for AI training. Such companies include

---

[43] https://www.bmi.com/news/ascap-bmi-and-socan-announce-alignment-on-ai-registration-policies
[44] https://www.bmi.com/special/bmi-and-ai

ElevenLabs, Musical AI, Symphonic, Soundverse, GEMA (through PLAI), GCX/Rightsify, and Troveo. Not only does this further undercut any "expediency" arguments, but it also directly demonstrates the harm Eight Mile Style faces to license with these forthright entities that license and pay for use of copyrighted music

87. And, of course, "Fair use presupposes good faith and fair dealing." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 540 (1985). Just as in *Harper & Row*, the copying and permanent retention of the Works (in addition to the millions of other copyrighted works) was not the "incidental effect but the *intended purpose*." *Id.* (emphasis kept). Worse, the illicit copying, removal of CMI, and permanent retention of these copyrighted works *for the purpose* of regurgitating infringing copies thereof or to create songs to directly compete falls well outside of the enumerated fair use activities set forth in the Copyright Act, 17 U.S.C. section 107. There is simply nothing fair about a company using theft to build for purely commercial purposes a multi-billion-dollar business while those from whom it steals receive nothing.

88. The Third Circuit held this to be true in *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*, No. 25-2153, 2026 WL 2932557 (3d Cir. Sept. 29, 2026). Analyzing the four fair use factors, the court explained that the legal research company ROSS's taking of information conglomerate and legal research engine Thomson Reuters' copyrighted materials to train its AI on how to be responsive to users' questions, as well as to compete with the product it was stealing from, was not fair use. This "is the same same-purpose reasoning" as that in GEMA v. Suno, where the Munich Regional Court "assessed the US fair use position on training carried out in the US and rejected it, finding that outputs served the same purposes as the originals rather than a new one, and that the use was commercial."[45]

## VII. Causes of Action

### First Cause of Action – Direct Copyright Infringement

89. Eight Mile Style re-alleges and incorporates by reference each and every allegation

[45] https://www.musicbusinessworldwide.com/a-us-appeals-court-has-rejected-a-fair-use-defense-over-ai-training-what-does-it-mean-for-the-labels-fight-with-suno/.

set forth in the preceding paragraphs as if set forth fully herein.

90. Eight Mile Style owns or exclusively controls valid, subsisting copyrights in the Works identified in Exhibit A.

91. Suno, without authorization from Eight Mile Style, reproduced Eight Mile Style's copyrighted Works by: (a) scraping or otherwise obtaining copies from streaming platforms and other online sources, including through the use of circumvention tools and services provided by Bright Data; (b) assembling those copies into training datasets; (c) storing and reproducing those copies, including server copies in a permanent, all-purpose internal repository maintained for indefinite reproductions for future use; (d) unlawfully reproducing the Works at issue here through the making of permanent server copies; and (e) processing those datasets through its model-training pipeline. Each such act independently violated Eight Mile Style's exclusive rights under 17 U.S.C. sections 106(1) and 106(2). Indeed, publicly available sources such as the leaked source code confirm that Suno is training on the Works. For example, in the leaked code are: "Lose Yourself" (including the title, artist metadata, and 4,210 characters of lyrics spanning the intro, verses, choruses, and outro, preserved in a saved Genius scraper result); "Without Me" (including two extended lyric passages containing 1,178 and 4,286 characters, in an inference notebook with code for supplying lyric text to an audio-generation function); "Till I Collapse" (including a 339-character excerpt of the introduction, preserved with attribution in an annotation that also includes a link to the lyrics on Genius); and "Cleaning Out My Closet," "Just Lose It," and "When I'm Gone" (each Genius song links and associated API paths in saved annotations).

92. None of these acts qualifies as a fair use. As the *Bartz I* court held, the indefinite retention of copyrighted works in a general-purpose repository for uncommitted future exploitation is not transformative and fails every factor of the fair-use test. The same reasoning applies to Suno's accumulation of copyrighted recordings for AI training at commercial scale without any license or compensating benefit to rights holders.

93. Defendant's infringement in these regards was willful. At all times relevant to this Complaint, Defendant had actual knowledge that it was making copies of the Works without license or payment.

94. Furthermore, Suno, without authorization from Eight Mile Style, has separately infringed and continues to infringe the Works each time Suno's AI music generator reproduces, displays, transmits, performs, or prepares a derivative work based upon the copyrighted Works. These infringing outputs include songs created in response to user prompts that are substantially similar, if not strikingly similar, to the Works and unlicensed derivative works that incorporate, without a license, the original, copyrighted elements of the Works.

95. Suno's leaked code shows that it deliberately enabled "stem splitting" *i.e.*, breaking up sound recordings of musical compositions into separate tracks for vocals, drums, and the various instruments played. Further, Suno purportedly also deliberately sought out *a cappella* versions of the songs so that it could more faithfully create vocals based upon the infringed Works and further train its AI model on multiple iterations of the musical composition, especially with regard to the lyrics of the song so that its model could "create" (*i.e.* regurgitate infringing derivative works) lyrics based thereupon.

96. In addition to using "stem splitting," Suno also used a training code that uses related recordings together. The Suno code puts a cover recording followed by the "main" (original) recording of the same song when creating a training data instance. That gives the Suno model the cover as reference audio while it learns to predict the main recording. In this manner, Suno uses multiple versions of a song during its AI model training. This could be used, for example, to take a copyrighted acoustic performance scraped from the internet by Suno without permission and generate a full-band version or turn a ballad into a dance track.

97. Each infringing output by Suno constitutes an independent violation of Eight Mile Style's exclusive rights to reproduce (section 106(1)), prepare derivative works (section 106(2)), distribute copies (section 106(3)), publicly perform (section 106(4)), and publicly display (section 106(5)) the Works.

98. Suno's output-stage infringement is willful. While Suno advertises that it enacted safeguards to prevent copying of copyrighted elements, these safeguards are easily overcome.

99. Eight Mile Style has been damaged by Defendant Suno's infringement and is entitled to recover actual damages and Defendant Suno's profits under 17 U.S.C. section 504(b), or in the

alternative, statutory damages of up to $150,000 per Work willfully infringed under 17 U.S.C. section 504(c). Eight Mile Style identifies 269 Works herein, meaning that the total statutory damages sought in this case is $40,350,000.00.

## SECOND CAUSE OF ACTION – CIRCUMVENTION OF PROTECTION MEASURES, 17 U.S.C. § 1201

100. Eight Mile Style re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

101. Eight Mile Style's copyrighted Works are hosted on licensed platforms that deploy technological measures to control access to those Works. These measures include, without limitation: user-authentication requirements (login credentials and session tokens), paid-subscription paywalls, CAPTCHA and bot-detection challenges, IP-based rate limiting, JavaScript rendering requirements, and Terms of Service and robots.txt directives restricting automated access. These measures effectively control access to Eight Mile Style's copyrighted Works within the meaning of 17 U.S.C. section 1201(a)(3)(B).

102. Suno violated 17 U.S.C. section 1201(a)(1) by circumventing—directly and through the use of Bright Data's tools and services—technological measures that effectively controlled access to Eight Mile Style's copyrighted Works on licensed streaming and lyrics platforms, thereby obtaining unauthorized access to and copies of those Works for use in training its AI model.

103. Defendant's violations of section 1201 was willful and conducted for commercial advantage and financial gain.

104. Eight Mile Style has been damaged by Defendant's violations and is entitled to remedies under 17 U.S.C. section 1203, including injunctive relief, actual damages or statutory damages of up to $2,500 per violation under section 1203(c)(3)(A), costs, and attorneys' fees. Therefore, Eight Mile Style seeks a total of $672,500.00 for its 269 Works listed in Exhibit A.

## THIRD CAUSE OF ACTION – REMOVAL OR ALTERATION OF CMI, 17 U.S.C. § 1202

105. Eight Mile Style re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

106. Eight Mile Style's copyrighted Works, as displayed on licensed lyrics platforms and streaming services, bear copyright management information within the meaning of 17 U.S.C.

section 1202(c), including: the title of the composition, the identity of the songwriter(s) and/or composer(s), the identity of the copyright owner and/or publisher (Eight Mile Style or its affiliates), and other identifying data such as ISRC codes and copyright notices.

107. Defendant intentionally removed or altered CMI from Eight Mile Style's copyrighted Works during its data-cleaning pipeline, in violation of 17 U.S.C. section 1202(b)(1). Upon information and belief, Defendant's engineers selected a data-extraction methodology that aggressively stripped authorship and ownership metadata, choosing it over available alternatives that would have preserved that information.

108. Defendant knew, or had reasonable grounds to know, that CMI is vital to protecting Eight Mile Style's copyright interests and that its removal and omission of CMI would induce, enable, facilitate, and/or conceal infringement. Suno was aware that its AI models memorize the training-data content. It follows that stripping CMI during training would conceal Suno's infringement. This satisfies the "double scienter" requirement established in *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 671, 673 (9th Cir. 2018); *see Concord Music Group, Inc. v. Anthropic PBC*, No. 5:24-cv-03811-EKL, 2025 WL 4808984, at *4-5 (N.D. Cal. Oct. 6, 2025) (holding similar allegations sufficient at the pleading stage, citing *Kadrey v. Meta Platforms, Inc.*, 2025 WL 744032 (N.D. Cal. Mar. 7, 2025), and *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 173 (2d Cir. 2020)).

109. Defendant's violations of section 1202 were willful and conducted for commercial advantage.

110. Eight Mile Style has been damaged by Defendant's violations and is entitled to remedies under 17 U.S.C. section 1203, including injunctive relief, actual damages or statutory damages of up to $25,000 per violation under section 1203(c)(3)(B), costs, and attorneys' fees. Therefore, Eight Mile Style seeks a total of $6,725,000.00 for its 269 Works listed in Exhibit A.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant Suno and grant the following relief:

(a) A declaration that Defendant committed willful copyright infringement of Eight Mile Style's copyrighted Works in violation of 17 U.S.C. sections 106 and 501;

(b) A declaration that Defendant has violated 17 U.S.C. section 1201 by circumventing technological measures effectively controlling access to Eight Mile Style's copyrighted Works;

(c) A declaration that Defendant has violated 17 U.S.C. section 1202 by intentionally removing or altering copyright management information from Eight Mile Style's Works and distributing copies with such information removed, with knowledge or reasonable grounds to know that doing so would induce, enable, facilitate, or conceal infringement;

(d) A permanent injunction prohibiting Defendant, and its officers, agents, employees, successors, and assigns, from further infringing Eight Mile Style's copyrights in the Works or engaging in any of the unlawful conduct alleged herein;

(e) An order directing Defendant to deliver for impoundment or destruction all unauthorized copies of Eight Mile Style's copyrighted Works in its possession, custody, or control—including copies retained in training datasets, internal repositories, model weights, and server infrastructure—pursuant to 17 U.S.C. section 503(b);

(f) An order requiring Defendant to provide a complete accounting of all training data, scraping activities, and datasets involving Eight Mile Style's copyrighted Works;

(g) An award of actual damages suffered by Eight Mile Style and disgorgement of Defendant's profits attributable to the infringement, pursuant to 17 U.S.C. section 504(b); or, in the alternative, an award of statutory damages of up to $150,000 per Work willfully infringed, pursuant to 17 U.S.C. section 504(c), which for all 269 Works would be $40,350,00.00;

(h) An award of actual damages or statutory damages of up to $2,500 per violation of 17 U.S.C. section 1201 and up to $25,000 per violation of section 1202, pursuant to 17 U.S.C. section 1203(c);

(i) An award of Eight Mile Style's reasonable attorneys' fees and costs of suit, pursuant to 17 U.S.C. sections 505 and 1203(b)(4)-(5);

(j) Pre-judgment and post-judgment interest at the maximum lawful rate; and

(k) Such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38(b).

Dated: November 19, 2026

*/s/ Richard S. Busch*

**ADAMS & REESE, LLP**
Richard S. Busch (SBN 319881)
Mark L. Block (SBN 115457)
David Niemierzycki (*pro hac vice* forthcoming)
Andrew H. "Drew" Davis (*pro hac vice* pending)
1600 West End Ave., Suite 1400
Nashville, TN 37203
Tel: (615) 259-1450
Fax: (615) 259-1470
richard.busch@arlaw.com
mark.block@arlaw.com
david.niemierzycki@arlaw.com
drew.davis@arlaw.com

**SKAGGS FAUCETTE LLP**
Jeffrey E. Faucette (SBN 193066)
Martin R. Glick (SBN 40187)
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
Tel: (415) 874-3181
Fax: (888) 980- 6547
jeff@skaggsfaucette.com
marty@skaggsfaucette.com

*Attorneys for Plaintiffs Eight Mile Style, LLC and Martin Affiliated, LLC*